**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIP WOOD, | ) | CASE NO. 1:15-CV-01224 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Philip Wood ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On November 28, 2008, Plaintiff filed his applications for POD, DIB, and SSI,

alleging a disability onset date of July 28, 2008.  (Transcript ("Tr.") 38.)  The claims

were denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  (*Id*.)  On January 7, 2011, an ALJ held Plaintiff's

hearing.  (*Id*.)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id*.)  A vocational expert ("VE") also participated and testified.  (*Id*.)  On

January 27, 2011, the ALJ found Plaintiff not disabled.  (Tr. 44.)  On April 3, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On May 29, 2012, in Case No. 1:12-cv-01339, Plaintiff filed a complaint challenging the Commissioner's final decision.  On December 27, 2012, the matter was reversed and remanded for further proceedings pursuant to a joint stipulation filed by the parties.

On November 13, 2013, a second hearing was held where Plaintiff, represented by counsel, testified.  (Tr. 321.)  A Medical Expert ("ME") and a VE also testified.  (*Id.*)  On December 31, 2013, the ALJ found Plaintiff not disabled.  (Tr. 337.)  On April 28, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 311.)

On June 18, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)

Plaintiff asserts the following assignment of error: (1) the evidence does not support the RFC determination as the ALJ erred in ascribing less weight to the opinions of a treating physician and the ME.  (Doc. No. 13. at pp. 11-15.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in September of 1954 and was 53-years-old on the alleged disability onset date.  (Tr. 43.)  He has a limited education and was able to

2

communicate in English.  (*Id.*)  He had past relevant work as a grinder, drill press

tender, and industrial cleaner.  (Tr. 335.)

**B.      Relevant Medical Evidence**[1]

**1.      Medical Reports**

On September 13, 2012, a chest x-ray revealed no acute or pleural effusion and

no pneumothorax was identified.  (Tr. 460.)  There was mild hyperinflation of the lungs

bilaterally.  (*Id.*)

On March 9, 2013, Plaintiff was seen by Shelaby Mostafa, M.D.  (Tr. 466.)

Plaintiff complained of shortness of breath with associated left sided chest pressure

and a worsening chronic cough.  (*Id.*)  Plaintiff's symptoms had "no correlation with

activity."  (*Id.*)  Dr. Mostafa noted there was no diagnosis of COPD.  (*Id.*)  Plaintiff was

noted as continuing to smoke and drinking a significant amount of beer.  (*Id.*)  An

echocardiogram revealed normal ejection fraction and no evidence of diastolic

dysfunction.  (Tr. 474.)  Plaintiff's symptoms were attributed to progressive COPD with

an episode of acute bronchitis on top.  (*Id.*)

On March 14, 2013, Plaintiff presented for follow-up.  (Tr. 491.)  He continued to

complain of shortness of breath and dizziness after walking 100 feet.  (Tr. 492.)

Examination revealed diminished breath sounds with decreased air exchange

bilaterally.  (Tr. 493.)

---

[1]  Plaintiff's lone assignment of error revolves exclusively around the weight ascribed to
the opinion of Ryan Boente, M.D., and the testimony of the ME, Cathy Krosky, M.D. –
specifically the limitations they assessed stemming from Plaintiff's breathing
impairments.  (Doc. No. 13 at pp. 12-14.)  The recitation of the medical evidence
focuses solely on these opinions and issues.

3

On April 22, 2013, Plaintiff underwent a pulmonary function study.  (Tr. 505-506.)
Plaintiff's FVC was 70% of predicted and improved to 71% post-bronchodilator; FEV1
was 53% of predicted and improved to 64% post-bronchodilator.  (Tr. 505.)  The results
were reviewed by Rajesh Kandasamy, M.D., and Marina Duran Castillo, M.D., who
found that total lung capacity, specific airway resistance, and diffusion capacity were all
normal.  (Tr. 607.)   Plaintiff was diagnosed with moderately severe obstructive
ventilatory impairment.  (*Id*.)

On May 2, 2013, Plaintiff presented to pulmonary and critical care fellow, Verai
Ramsammy, M.D.  (Tr. 613-17.)  Plaintiff's history of present illness included dyspnea
on exertion, occasional chest pains, and daily cough with sputum.  (Tr. 613.)  He
admitted to alcohol abuse and stated he "[n]eeds it as an eye opener" and "shakes"
when he goes without alcohol for a day.  (Tr. 613-14.)  His daily consumption was noted
as between 2 to 4 forty ounce beers per day.  (Tr. 615.)  Physical examination of the
lungs revealed they were diminished bilaterally with no wheezing.  (*Id*.)  Plaintiff was
diagnosed with emphysema with bronchospastic component.  (*Id*.)  Plaintiff also had
small bruises on his forearms stemming from lifting heavy objects.  (*Id*.)

On June 13, 2013, Plaintiff was first seen by Ryan Boente, M.D., a resident at an
urgent care clinic.[2]  (Tr. 648-650.)  Plaintiff stated that "shortness of breath is still a
problem at times."  (Tr. 649.)  He had an occasional wheeze, a long standing cough,
and no change in sputum.  (*Id*.)  Examination revealed "mild end expiratory wheeze."

---

[2]   During the visit, Dr. Boente was supervised by teaching physician, Susan Gifford,
M.D., who evaluated the patient, obtained critical portions of the medical history, and
physically examined him.  Dr. Gifford agreed with the resident's decision making.  (Tr.
650.)

(*Id*.)  Plaintiff was advised to quit smoking and was prescribed a Nicoderm patch.  (Tr. 650.)

On June 17, 2013, Plaintiff underwent an exercise oximetry study.  (Tr. 654.)  At rest, Plaintiff's oxygen saturation was 97 percent.  (*Id*.)  After walking 1428 feet (just over a quarter mile) for 6 minutes at a normal pace, Plaintiff's oxygen saturation remained at or above 95 percent.  (*Id*.)  James Finley, M.D., who administered the study, found that Plaintiff, with exercise, experienced no significant oxygen desaturation and determined Plaintiff did not require supplemental oxygen while awake, at rest, or during low-level daily activities.  (*Id*.)

On September 16, 2013, Plaintiff presented to the emergency room (ER) asserting that he had been coughing up blood.  (Tr. 705-708.)  Plaintiff denied having any prior occurrences.  (*Id*.)  ER staff noted that Plaintiff admitted to having consumed 3 forty-ounce beers and that he was intoxicated.  (*Id*.)  He also complained of mild shortness of breath and lightheadedness.  (Tr. 705.)  Emily Dodge, M.D., noted that she was unable to perform a physical exam due to patient refusal.  (Tr. 706.)  "Immediately after finishing HPI [History of Present Illness] patient requests to leave; states he wants to go out and continue drinking EtOH [alcohol] to celebrate his birthday."  (Tr. 707.)  Plaintiff left the hospital against medical advice.  (*Id*.)

On October 3, 2013, Plaintiff presented to Dr. Boente.[3]  (Tr. 740-41.)  He complained of one day of increased shortness of breath with exertion and increased wheezing.  (Tr. 740.)  Plaintiff stated that on a good day, he could walk half a block

---

[3]  On this occasion, Randall D. Cebu, M.D., supervised Dr. Boente and agreed with the resident's decisions.  (Tr. 741.)

without getting short of breath.  (*Id.*)  On examination, Dr. Boente noted "decreased breath sounds bilaterally, prolonged expiratory phase, no wheezes or rhonchi heard?" (Tr. 741.)  Dr. Boente noted that Plaintiff was not taking his medications as prescribed, instructed Plaintiff that he must stop smoking, and advised him to cut back on drinking. (*Id.*)  Dr. Boente assessed COPD, major depression, hematochexia, and alcohol dependence.  (*Id.*)

The same day, October 3, 2013, Dr. Boente, who specializes in internal medicine, completed both psychological and physical physician questionnaires.[4]  (Tr. 732-34.)  In the psychological questionnaire, Dr. Boente was asked to state the date of Plaintiff's initial examination and the nature and frequency of his visits.  (Tr. 732.)  Dr. Boente did not answer the question other than to state he had diagnosed Plaintiff with major depression.  (*Id.*)  He described Plaintiff's symptoms as insomnia, depression, difficulty concentrating, feelings of guilt, and past (but not current) thoughts of wanting to hurt self or others.  (*Id.*)  When asked what side effects are caused by Plaintiff's medications, Dr. Boente simply responded that Plaintiff was starting therapy.  (*Id.*)  He opined that: Plaintiff would have moderate to great difficulty, both psychologically and physically, sustaining a regular 40-hour work week (*Id.*); Plaintiff would experience symptoms severe enough to interfere with attention and concentration 2 to 3 times per week and that he "would likely have difficulty" responding appropriately to work pressures and maintaining a schedule (Tr. 733); and that "most of the time," Plaintiff was not impaired in his ability to get along with co-workers, supervisors, and the general

---

[4]  The two questionnaires were not co-signed by Dr. Boente's supervising physicians.

6

public.  (*Id*.)

In the physical questionnaire, also completed the same date, Dr. Boente stated that Plaintiff had been diagnosed with moderate COPD/emphysema and hypertension, but did not respond as to whether these diagnoses had been confirmed by clinical, laboratory and/or diagnostic testing.  (Tr. 734.)  He indicated that Plaintiff's symptoms included shortness of breath, cough, fatigue, and shortness of breath on exertion.  (*Id*.)  He opined Plaintiff could stand/walk for 3-5 hours and sit for 8 hours in an 8-hour workday.  (*Id*.)  He further indicated Plaintiff could lift 10 to 15 pounds occasionally, would miss 3 to 5 days of work a month, and required three 20-minute breaks and a lunch break during an 8-hour workday.  (Tr. 735.)

On November 5, 2013, Plaintiff was again seen by Dr. Boente.  (Tr. 773-74.)  Physical examination revealed non-labored breathing, distant breath sounds on auscultation, and only distant wheeze.  (Tr. 774.)  He was diagnosed with depression and moderate COPD.  (*Id*.)

## 2. Agency Reports

On February 10, 2009, Mehdi Saghafi, M.D., performed a physical consultative examination.  (Tr. 248-253.)  Plaintiff's chief complaint was shortness of breath and occasional tremors.  (Tr. 248.)  On physical examination, Dr. Saghafi noted blood pressure of 150/100, a heart rate of 80 beats per minute with no thrills or murmurs, no shortness of breath, clear lung fields, nor rales or wheezing, and a normal gait.  (Tr. 248-49.)  Dr. Saghafi diagnosed synovial cyst proximal end of the right first metacarpal, shortness of breath, and asthma per history.  (Tr. 249.)  Manual muscle testing showed

5 of 5 in all categories; range of motion and all areas of manipulation tested normal.
(Tr. 250-53.)  Dr. Saghafi opined that Plaintiff could sit, stand and walk for 6 to 8 hours;
lift/carry 30-40 frequently and 41-80 pounds occasionally; push/pull, manipulate objects,
and operate hand and foot controls without restriction; and climb stairs.  (Tr. 249.)
Speech, hearing, memory, orientation, and attention were all within normal range.  (Tr.
249.)

On March 18, 2009, Ronald Cantor, M.D., a state agency consultant, completed
a physical residual functional capacity assessment.  (Tr. 254-261.)  Dr. Cantor
opined that Plaintiff could lift/carry/push/pull 25 pounds frequently and 50 pounds
occasionally; stand/walk for 6 hours and sit for 6 hours; and had no postural,
manipulative, visual, or communicative limitations.  (Tr. 256-58.)  However, Plaintiff
should avoid concentrated exposure to fumes, odors, gases, and poor ventilation.[5]  (Tr.
258.)

On July 2, 2009, Plaintiff underwent a second consultative examination
conducted by Franklin D. Krause, M.D.  (Tr. 282.)  Dr. Krause diagnosed COPD with
possible moderate severity, history of low back pain without evidence of radiculopathy,
and history of alcohol abuse.  (*Id*.)  Dr. Krause noted an x-ray from the same date,
which showed mild diffuse emphysema in both lungs and mild osseous
demineralization.  (Tr. 266, 282.)  The x-ray was normal in other respects.  (Tr. 266.)
Dr. Krause also noted the results of a pulmonary function study performed the same

---

[5]  On July 21, 2009, after Plaintiff alleged a worsening of his condition, state agency
consultant Nick Albert, M.D., reviewed the record and affirmed Dr. Cantor's RFC
assessment.  (Tr. 262, 285.)

date.  (Tr. 271-73, 283.)  He indicated that Plaintiff had oxygen saturation of 98% on

room air, and that "[p]ulmonary function studies ... were not at all consistent before

bronchodilators and there was less effort but more consistency after bronchodilators."

(Tr. 283.)  Dr. Krause made no specific recommendations.  (Tr. 283.)

**C.    Hearing Testimony**

   **1.    Plaintiff's Hearing Testimony**

At the second hearing held on November 12, 2013, Plaintiff testified as follows:

•    He became disabled in 2008 when he "had to go to court and stuff."  He
     went to jail for six months and tried to work after he was released.  He
     could "hardly breathe" and could not perform any lifting.  Therefore, he
     was laid off and he has not worked since that time.  (Tr. 346-47.)

•    He had previously been imprisoned between 1999 and 2002.  (Tr. 347.)

•    He is out of breath when he walks for too long.  His back hurts when he
     sits for too long.  He has "bad feet."  He cannot perform a lot of lifting
     because he gets "real nervous sometimes."  He constantly has problems
     with his back and with breathing.  (Tr. 348.)

•    In 2008, he was smoking a couple of packs of cigarettes per day.  He was
     smoking 6 to 8 cigarettes daily at the time of the hearing.  (Tr. 348.)

•    He quit drinking alcohol after he was released from prison, but stated he
     had a few beers a few days earlier.  He admitted telling a doctor earlier in
     2013 that he needed a beer to settle his nerves as he would get the
     shakes.  (Tr. 349-350.)

•    He could not afford medication.  (Tr. 351.)

•    He has not seen a psychiatrist since he was released from prison.  (Tr.
     352.)

•    He cannot read without his glasses due to a flash burn suffered while he
     was welding.  He last had his eyes examined in 2002.  (Tr. 352-53.)

•    When he is short of breath, he gets a cup of coffee, sits down, and tries to
     relax.  He has an inhaler which he uses twice a day.  (Tr. 353-54.)

- He can walk no more than 10 to 15 minutes before being out of breath. He needs 20 to 30 minutes of rest to recover.  (Tr. 354.)

- He can hardly lift anything.  He cannot pick up his grandson, who weighs 22 pounds, without hurting his back.  (Tr. 354-55.)

- Hot and cold weather affect his breathing, as do fumes and dust. Smoking does not bother him.  (Tr. 356.)

- He is not receiving any treatment for depression, but was taking Amitriptyline, which had little affect on his mood.  (Tr. 356-57.)

- He gets along with other people.  (Tr. 357.)

**2.    Medical Expert's Testimony**

The ME testified at the hearing as follows:

- Plaintiff's first "severe" impairment was chronic obstructive pulmonary disorder (COPD) and a diagnosis of asthma.  She noted Plaintiff complained of exertional shortness of breath and chronic cough.  She further noted the results of a pulmonary function test from July 2, 2009 revealed moderate obstruction due to COPD.  (Tr. 360.)  She also noted a normal EKG from April of 2008, a chest x -ray from 2012 showing hyperinflation and past rib fractures, Plaintiff's complaints in treatment notes, a chest x-ray from 2013, and a fairly good echocardiogram from March of 2013.  (Tr. 360-61.)

- She pointed to another impairment, bilateral peripheral neuropathy of the lower extremities below the knees, as diagnosed in March of 2013.  She noted the physician was unsure as to the cause, indicating that it could be secondary to toxin or induced by chronic alcohol use.  (Tr. 362.)

- She identified foot pain stemming from untreated foot calluses as another potential impairment.  (Tr. 362.)

- She identified noted Plaintiff's eye injuries and the results of the consultative examination, but indicated she did not see a formal eye exam anywhere in the record.  (Tr. 362-63.)

- She noted several other conditions, such as a history of hypertension, Plaintiff's lack of maxillary teeth and the extraction of eight mandibular teeth, right elbow septic bursitis in 2010 which went untreated after Plaintiff eloped from the ER, a synovial cyst on the right hand, a back

10

injury from childhood, and longstanding alcohol and tobacco abuse, and depression.  (Tr. 362-65.)

• None of Plaintiff's impairments, either singularly or in combination, would meet or equal a listing.  (Tr. 365.)

• Given Plaintiff's COPD, neuropathy of the leg, and Plaintiff's statement that he is out of breath after walking 100 feet, Plaintiff would be able to perform, at most, "light work, maybe even at a sedentary level."  She noted Plaintiff's testimony that he could not walk 100 feet without shortness of breath.  She also stated she "wouldn't want [Plaintiff] on ladders, ropes, or scaffolds ... [or] balancing."  Due to Plaintiff's back complaints, she opined he should only occasionally stoop, crouch, or use stairs.  She also stated he should avoid dust, fumes, strong odors, humidity, and extreme hot or cold.  (Tr. 366.)  She noted it was difficult to get a good sense of his limitations, as "[t]he doctors really don't talk about it in their notes." (Tr. 366-67.)

• In response to a question from the ALJ, the ME testified that Plaintiff's depression could very well be substance induced mood disorder.  (Tr. 367.)

### 3.   Vocational Expert's Hearing Testimony

The VE testified that Plaintiff's past relevant work would be classified as: (1) grinder, Dictionary of Occupational Titles ("DOT") 705.687-014 with an SVP of 2, unskilled at the medium exertional level; (2) drill press tender, DOT 606.685-026 with an SVP of 3, semi-skilled and medium; and, (3) industrial cleaner, DOT 381.687-018 with an SVP of 2 and medium.  (Tr. 368-69.)

The ALJ posed the following hypothetical to the VE:

This person is male.  Currently 59 years of age.  Same work background and education as Mr. Wood.  This person can lift/carry 50 pounds occasionally, 25 pounds frequently.  Can walk six out of eight.  Can stand six out of eight.  Can sit six out of eight.  Can frequently push, pull, and foot pedal.  This person can frequently use a ramp or a stairs.  Frequently use a ladder, rope, or a scaffold.  Could frequently stoop, kneel, crouch, and crawl.  Manipulative capabilities are all constant.  Visual capabilities are all frequent.  Communication skills are constant.  This person should avoid high concentrations of cold, and heat, smoke, fumes, dust, and

pollutants.  This person can do no complex tasks but can do simple,
routine tasks.  And that's it.

(Tr. 370.)

The VE testified that such an individual could perform all of Plaintiff's past

relevant work.  (Tr. 370.)  In addition, such a person could perform the following jobs:

packager, DOT 920.587-018 with an SVP of 2, unskilled, medium exertion (800 jobs

locally, 5,200 in Ohio, 86,000 nationally); dishwasher, DOT 318.687-010 with an SVP of

2, unskilled, medium exertion (1,000 jobs locally, 5,800 in Ohio, 190,000 nationally);

and, assembler, DOT 806.684-010 with an SVP of 2, unskilled, medium (2,900 jobs

locally, 19,000 in Ohio, 295,000 nationally).  (Tr. 371.)

The ALJ proceeded to pose a second hypothetical:

This person can lift/carry 50 pounds occasionally, 25 pounds frequently.
Can walk six out of eight.  Stand six out of eight.  Sit six out of eight.
Frequent push/pull and foot pedal.  Frequent ramp or stairs.  Never ladder
-- pardon me.  Never ladder, rope, or scaffold.  Never balance.
Occasional stoop, kneel, crouch, crawl.  Manipulative capabilities are
frequent reach, handle, and feel.  Occasional finger.  Visual capabilities
are all frequent.  Communication skills are constant.  No high
concentrations of heat or cold.  No high concentrations of smoke, fumes,
dust, and pollutants.  This person should avoid dangerous machinery and
unprotected heights.  Additionally, this person can do no complex tasks
but can do simple, routine tasks.  This person would be off-task 20
percent of the time and miss three days or more of work per month.  And
that's it.

(Tr. 371-72.)

The VE testified that such an individual could not perform Plaintiff's past relevant

work and, moreover, would be unemployable.  (Tr. 372.)

The ALJ posed a third hypothetical, asking the VE to keep the limitations from

the first hypothetical with one change – lifting/carrying restricted to 20 pounds

12

occasionally and 10 pounds frequently. (Tr. 372.) The VE testified that such a change would eliminate all past relevant work. (Tr. 372.) However, such an individual could perform the following jobs: small product assembler, DOT is 706.684-022.450 with an SVP of 2, unskilled, light exertion (450 jobs locally, 1,500 in Ohio, 55,000 nationally); dining room attendant, DOT 311.677-010 with an SVP of 2, unskilled, light (750 jobs locally, 3,400 in Ohio, 114,000 nationally); and, sales attendant, DOT 299.677.010 with an SVP of 2, unskilled, light (1,300 jobs locally, 6,900 in Ohio, 193,000 nationally). (Tr. 372-73.)

In a fourth and final hypothetical, the VE was instructed to keep the limitations from the second hypothetical with one change – lifting/carrying restricted to 20 pounds occasionally and 10 pounds frequently. (Tr. 373.) Again, the VE testified that such an individual could not perform Plaintiff's past relevant work or any other jobs. (Tr. 373.)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520© *and* 416.920©.  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Mr. Wood meets the insured status requirements of the Social Security Act through December 31,2013.

2.   Mr. Wood has not engaged in substantial gainful activity since July 28, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

14

3.   Mr. Wood has the following severe impairments: chronic obstructive pulmonary disease (COPD), major depressive disorder, peripheral neuropathy, and alcohol dependence (20 CFR 404.1520(c) and 416.920(c)).

4.   Mr. Wood does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that Mr. Wood has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), with restrictions. Specifically, Mr. Wood can lift and carry up to 50 pounds occasionally and 25 pounds occasionally.  In an eight-hour workday, Mr. Wood can stand or walk for six hours and sit for six hours.  He can frequently push, pull and use foot pedals.  He can constantly balance and frequently climb, stoop, kneel, crouch and crawl.  He must avoid high concentrations of temperature extremes, smoke and fumes.  He cannot perform complex tasks, but can perform simple, routine tasks.

6.   Mr. Wood is capable of performing past relevant work as a grinder, drill press tender and industrial cleaner.  This work does not require the performance of work-related activities precluded by Mr. Wood's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   Mr. Wood has not been under a disability, as defined in the Social Security Act, from July 28, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 323-37.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

## B.    Plaintiff's Assignment of Error

Plaintiff contends that the RFC finding is erroneous because the evidence does not support a finding that he could perform the requirements of medium exertional work.  (Doc. No. 13 at p. 11.)  A close reading of Plaintiff's argument reveals that he is essentially challenging the weight ascribed to two physicians of record, namely Dr. Boente and Dr. Krosky, the ME who testified at the hearing.  (Doc. No. 13 at pp. 11-13.)

16

### 1.  Dr. Boente

Plaintiff appears to argue that Dr. Boente is a treating physician.[6]  (Doc. No. 13 at p. 12.)  The Commissioner contends that the ALJ gave sufficient reasons for rejecting the opinion of Dr. Boente and further questions whether Dr. Boente can be deemed a treating source.  (Doc. No. 15 at pp. 19-22.)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

---

[6]  It is clear from the medical records that Dr. Boente was a resident and was supervised by a more experienced teaching physician.  The Commissioner has not argued that Dr. Boente was not an "acceptable medical source" because he was not a "licensed physician" pursuant to 20 C.F.R. §§ 404.1513 & 416.913.

17

Here, the ALJ addressed Dr. Boente's opinion as to Plaintiff's *physical*[7]

limitations as follows:

> Ryan Boente, M.D., completed a questionnaire regarding Mr. Wood's
> physical and mental capacity on October 3, 2013 [Exhibit 15F].  Dr.
> Boente noted that he is an internist, but did not indicate when he began
> treating Mr. Wood.  Regarding Mr. Wood's physical impairments, Dr.
> Boente listed his diagnoses as moderate COPD/emphysema and
> hypertension.  He determined that Mr. Wood can sit for eight hours of an
> eight-hour workday, stand or walk for three to five hours of an eight- hour
> workday, and lift up to 15 pounds.  He stated that Mr. Wood would require
> three 20-minute unscheduled breaks in addition to a lunch break and
> would miss three to five days of work a month due to his impairments.  I
> gave less weight to Dr. Boente's opinion. The evidence does not establish
> a long treatment history with Dr. Boente.  The record shows that
> Dr. Boente saw Mr. Wood on June 13, 2013, but there are no other
> records from Dr. Boente.  Mr. Wood had not sought regular medical
> treatment until March 2013.  Although the treatment records from Dr.
> Boente and other treating physicians do establish COPD that would
> impose some limitations on Mr. Wood's exertional capacity, the
> restrictions Dr. Boente proposes are not supported.  Mr. Wood has
> reported being able to lift 30 pounds and was noted by Dr. Ramsammy on
> May 2, 2013 to have bruises on his right arm from lifting heavy boxes,
> demonstrating Mr. Wood's ability to lift and carry more than 15 pounds
> [Exhibit 3E; Exhibit 13F:115].  Dr. Boente does not discuss the basis for
> limiting Mr. Wood's standing and walking limitations or for the need
> for unscheduled breaks and work absences.  These limitations are not
> supported by the treatment records in evidence, the exercise oximetry
> results or the PFT finding of significant bronchodilator response.

(Tr. 330-31.)

The ALJ did not affirmatively find that Dr. Boente constituted a treating source,

specifically, albeit incorrectly, stating that he had seen Plaintiff on only one occasion.

According to the record, Dr. Boente saw Plaintiff three times, though only twice before

he authored the October 3, 2013 opinion.  (Tr. 648-50, 732-34, 740-741, 773-74.)  Any

---

[7]  Plaintiff's brief explicitly states that he "does not dispute the ALJ's evaluation of his
limitations resulting from mental impairments."  (Doc. No. 14 at p. 4.)

subsequent treatment visits Plaintiff had with Dr. Boente are simply irrelevant as to whether the October 3, 2013 opinion was that of a treating physician *when it was completed*.  *See, e.g., Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506 (6th Cir. 2006) ("The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician at the time he rendered his opinion."); *accord Witnik v. Colvin*, 2015 U.S. Dist. LEXIS 19450 at *12 (N.D. Ohio, Feb. 18, 2015) (White, M.J.).  The *Kornecky* decision declined to find a treating physician relationship had been established, noting that visits to a physician *after* the RFC assessment had been made "could not retroactively render [the doctor] a treating physician at the time of the assessment."  167 Fed. Appx. at 506 n.10.

Furthermore, the Commissioner correctly points out that the Sixth Circuit has generally found that only two visits are insufficient to confer treating physician status on a medical source.  *See, e.g., Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("two examinations did not give Dr. Meerschaert a long term overview of [claimant's] condition."); *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005) ("two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain"); *accord Cooper v. Astrue*, 2011 WL 1118514, at *10 (S.D. Ohio Jan. 25, 2011), *report and recommendation adopted,* 2011 WL 1125185 (S.D. Ohio Mar. 24, 2011) ("Generally, the Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations."); *Hickman v. Colvin*, 2014 U.S. Dist. LEXIS 82914 at *34 (M.D. Tenn. June 18, 2014) ("Precedent in this Circuit suggests that a physician who treats an individual only twice

19

or three times does not constitute a treating source."); *Beauchamp v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 37456 at *27 (N.D. Ohio Mar. 21, 2014) (finding two visits insufficient and noting that "the treating physician doctrine is based on the assumption that a medical professional has dealt with a claimant and his condition over a long period of time will have a deeper insight into the medical condition than a person who has examined a claimant but once.") (Knepp, M.J.).

As such, Dr. Boente did not qualify as a treating source.  Therefore, as discussed in the section below, the ALJ was only required to *explain* – rather than give good reasons – for discounting his opinion.  Here, the ALJ gave a lengthy and detailed explanation setting forth numerous reasons for ascribing Dr. Boente's opinion less weight.  Plaintiff contends that the ALJ gave too much significance to a notation in the medical records that he was lifting heavy objects and also offers a contrary interpretation of the objective medical tests, suggesting that they were not inconsistent with Dr. Boente's opinion.  (Doc. No. 13 at pp. 12-13.)  Plaintiff's argument that the medical records could be interpreted differently is an insufficient basis for seeking a remand, and this Court does not conduct *de novo* review of the evidence.

## 2. Dr. Krosky, the ME

Plaintiff also argues that there is not substantial evidence in the record to support the ALJ's rejection of the ME's opinion, specifically arguing that the RFC adopted by the ALJ was greater than that determined by the ME.  (Doc. No. 13 at 14.)

An RFC is an indication of a claimant's work-related abilities despite his limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but

an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")

Furthermore, it is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source, such as the ME in the instant case, contradicts the RFC finding, an ALJ must explain why he did not include those limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment

21

conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).  Phrasing it another way,  although, "[ALJs] and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, 1996 SSR LEXIS 3, *5, 1996 WL 374180, *2 (Jul. 2, 1996).

The ALJ addressed the ME's decision as follows:

Dr. Krosky testified that Mr. Wood would be capable of light work, at the most, due to his COPD.  She noted that Mr. Wood has reported that he cannot walk more than 100 feet without becoming short of breath.  Dr. Krosky also determined that Mr. Wood should not climb ladders, ropes or scaffolds; never balance due to peripheral neuropathy; occasionally stoop and crouch due to back pain; never drive due to alcohol abuse; and should avoid dust, fumes, odors, temperature extremes and humidity.  I gave weight to Dr. Krosky's opinion regarding avoidance of exposure to pulmonary irritants, as it is supported by the evidence.  I gave less weight to Dr. Krosky's opinions regarding Mr. Wood's exertional and postural limitations as they appear to be based on Mr. Wood's subjective complaints and they are inconsistent with the evidence.  Mr. Wood reported having lifted heavy boxes in May 2013, indicating greater lifting and carrying ability [Exhibit 14F:115].  Although the record contains a diagnosis of peripheral neuropathy, examining physicians have consistently reported normal strength, sensation, reflexes and coordination in the lower extremities [Exhibits 5F and 10F; Exhibit 14F:159 and 185].  There is no objective evidence of imbalance or difficulty standing or balancing.  The stooping and crouching limitations Dr. Krosky proposed to accommodate Mr. Wood's back pain are not supported by the evidence, as there is no evidence of regular treatment for back pain and examining physicians have noted that Mr. Wood has full or almost full range of motion in the lumbar spine [Exhibits 5F and 10F].  For these reasons, I did not give full  weight to Dr. Krosky's opinion.

(Tr. 333.)

Here, Plaintiff questions the reasons given by the ALJ for discounting the ME's opinion that Plaintiff could perform, at most, light exertional work.  (Doc. No. 13 at pp.

14-15.)  This line of argument seemingly invokes the "good reasons" requirement of the treating physician rule, as Plaintiff suggests the ALJ erred by failing to provide valid reasons for assigning less weight to the opinions of the ME.  However, an ME is the functional equivalent of a non-examining source.  Plaintiff is undoubtedly correct that the ME had available to her a greater range of medical and treatment data than any other medical source.[8]  As a non-treating, non-examining source, the ALJ was not required to evaluate the ME's opinion with the same standard of deference as he would have applied to an opinion rendered by a treating physician who had an ongoing treatment relationship with Plaintiff.  Rather, the ALJ was merely required to acknowledge that the ME's opinion contradicted his RFC finding, and explain why he did not include the limitations she assessed in the ultimate RFC determination.  The ALJ's detailed analysis of the ME's opinion is more than sufficient to meet this explanation requirement.

Finally, without any meaningful explanation, Plaintiff also claims that the opinions of Dr. Cantor and Dr. Saghfi were obsolete simply because additional evidence was submitted in the record after they rendered their opinions and that their opinions should have been given less weight than those of Dr. Boente or the ME.  (Doc. No. 13 at pp. 11-12.)  Plaintiff has provided no legal support for this argument, and this Court is unaware of any authority stating that an ALJ cannot rely on the opinions of state agency reviewing physicians because the record was not complete at the time they rendered

---

[8]  It is indeed difficult to imagine a scenario where the ME would not be in a position of having greater access to the medical records than any other medical source. Nonetheless, the regulations do not require the ALJ to defer to an ME's opinion when determining a claimant's RFC.

their opinions.  Here, as discussed in detail above, the ALJ adequately explained his rationale for affording less weight to both Dr. Boente and the ME.  The ALJ was responsible for determining Plaintiff's RFC and considered the opinions of every medical source, as well as the objective medical evidence of record.  The ALJ provided a thorough analysis of the various opinions of Plaintiff's alleged treating source, the consultative examiners, the non-examining medical sources, as well as the ME.  The ALJ articulated his reasons for assigning less than controlling weight to those opinions, or otherwise made findings consistent with them.

Plaintiff's sole assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 11, 2016

24